**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
CHARLOTTE **DIVISION**
**CIVIL ACTION NO.** 3:17-CV-00605-KDB-DCK

| | | |
|---|---|---|
| **CHARLES A. WOODS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| **MANN+HUMMEL FILTRATION TECHNOLOGY U.S. LLC, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

Plaintiff Charles Woods ("Woods") was a long-time manufacturing line employee of Defendants Mann+Hummel Filtration Technology U.S. LLC, Mann+Hummel USA, Inc. and Mann+Hummel Filtration Technology Group, Inc. (together, "Mann+Hummel" or the "Company"). In this action, Woods asserts claims for employment discrimination based on alleged violations of the Americans with Disabilities Act ("ADA") and the Family Medical Leave Act (FMLA"), racial discrimination, retaliation, wrongful discharge and other related state law and declaratory claims. Now before the Court is Defendants' Motion for Summary Judgment ("Motion") on all claims (Doc. No. 36), which Woods opposes.

The Court has carefully considered the Motion and the parties' briefs and exhibits and heard oral argument from the parties' counsel during a hearing on the motion held July 25, 2019. The parties do not materially dispute the applicable legal principles and the elements of the various causes of action. They do, however, dispute whether there is enough evidence in the record to create a genuine issue of material fact, i.e. a basis on which a reasonable jury could rule in favor of the Plaintiff on his various claims. For the reasons discussed below, the Court finds

that the Company is not entitled to summary judgment on Woods claims under the ADA but is entitled to summary judgment on Woods' remaining claims of racial discrimination, retaliation, alleged FMLA violations and other causes of action. Accordingly, the Court will in part **GRANT** and in part **DENY** the Motion and enter **Partial Summary Judgment** in favor of Defendants as set forth below.

## I.    LEGAL STANDARD

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if it might affect the outcome of the suit under the governing law." *Vannoy v. Federal Reserve Bank of Richmond*, 827 F.3d 296, 300 (4th Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003)**.** "The burden on the moving party may be discharged by 'showing' ... an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial," *Id.* at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id.* at 324.

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014); *see also Anderson*, 477 U.S. at 255. "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed.1998)). "The court therefore cannot weigh the evidence or make credibility determinations." *Id.* at 569 (citing *Mercantile Peninsula Bank v. French* (*In re French*), 499 F.3d 345, 352 (4th Cir. 2007)).

However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Also, the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Id.* If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id.* at 249-50.

In the end, the question posed by a summary judgment motion is whether the evidence as applied to the governing legal rules "is so one-sided that one party must prevail as a matter of law." *Id.* at 252.

## II.    FACTS AND PROCEDURAL HISTORY[1]

Woods was hired by MANN+HUMMEL, formerly known as Wix Filtration Corp., in August 1972. In his last five to six years of employment, Woods, who is African American, worked as a Set-Up Person (a/k/a "Set-Up Operator") at the company's Allen plant, which is one of the most highly paid hourly wage positions. In the Allen plant, the Company manufactures filters, primarily for automotive and industrial applications. As a Set-Up Operator, Woods was expected to set up the equipment to run the desired product and to "assist in maintaining all equipment according to engineering specifications and appropriate work instructions." The physical requirements of the Set-Up Operator position include the "[a]bility to move a minimum of 50 lbs." Woods worked on the first shift, which is the most desirable.

Woods was diagnosed with prostate cancer in January 2015. Following his diagnosis, Woods requested and received approved FMLA leave[2] to have surgery. He remained out of work on leave from April 20, 2015 through July 23, 2015. Although Woods exhausted his FMLA leave in early July, the company gave him additional unpaid medical leave until he was ready to return. When he returned to work, Woods went back to his regular job as a Set-Up Operator. While on leave, Woods was entitled to receive short term disability payments for up to twenty-six (26) weeks.

After his return from surgery, Woods was able to perform his job, but his prostate surgery resulted in male incontinence and the problem was exacerbated by heavy lifting. Defendants claim that they did not regard Woods as disabled since he continued to perform all

---

[1] This summary of the facts is taken from the record as filed by the parties.
[2] Statutory FMLA leave is unpaid, but sometimes, as here, an employer will also provide short term disability payments as an employment benefit.

duties of his regular job satisfactorily but did allow him to take all the bathroom breaks necessary to "accommodate" his incontinence.

In early November 2015, Woods discussed his incontinence issues with his urologist and the doctor gave him a three-month medical restriction that prohibited him from lifting 50 lbs. or standing greater than 50% of the time. As a result of these medical restrictions, Woods was restricted from performing the essential functions of his regular job as a Set-Up Operator. Although the Company says that it continued to believe that Woods could perform his job because he had been doing satisfactory work since he returned from surgery in July 2015, the Company honored Woods' medical restrictions and removed him from the Set-Up Operator position on November 4, 2015.

Woods filed an affidavit in which he alleges that he requested a reasonable accommodation based on his disability when he received these medical restrictions. He further alleges that he was told by Wes Sorrells, his supervisor, that "the company would not allow me to return to work with the restrictions, and that there would be no accommodation of [Woods'] restrictions…. Sorrells told me … that I should file for short-term disability instead; and when that expired, I should apply for long term disability; and when that expired, I should go ahead and retire." The Company's HR manager, Scott Carter, filed an affidavit alleging that he and others tried to find a position that would comply with Woods' medical restrictions, but were unsuccessful.

Woods never returned to work after November 4, 2015. Without a position to work in, Woods applied for FMLA leave, but his request was denied because he had already exhausted his FMLA leave during the preceding 12-month period. However, the Company did provide him with an unpaid medical leave of absence and some opportunity to apply for work as

discussed below. There is no dispute Woods was paid everything he was owed for his work through November 4, 2015, and Woods received short term disability benefits until they were exhausted in February 2016. The company does not offer sick pay or severance pay to hourly employees.

The Company's "process" for allowing employees who are on unpaid medical leave to return to work is in dispute, or at least uncertain. While the Company has indisputably allowed some employees to return to the positions they held prior to their FMLA or medical leave, the Company alleges that its typical process for filling positions that become available in the plant is through a "bid" process in which current employees are given an opportunity to apply for open positions. The Company contends that it maintains an "open jobs list," which is a list of jobs in the plant that either no one bid on or for which there were no qualified bidders. They include all available jobs for all shifts, including all open assembly line positions. Any employee is free to take a job on the "open jobs list" at any time.

On the one hand, the company says that open positions are filled on a first come basis so that the most desirable positions are filled quickly. On the other hand, some positions in higher pay grades are apparently filled based on a comparison of qualifications among those who have applied. Carter's affidavit acknowledges, however, that "[m]ost jobs at the plant are filled on the basis of seniority."

While Woods was out on medical leave, Defendants did not proactively offer him jobs that he could do with his medical restriction or even give him immediate notice of open positions, but instead simply permitted him to come in and "bid" on open positions as if he was still working in the plant (which, of course, he was not). In January 2016, Woods bid on a

Utility/Parts Operator position (a/k/a Line-Hauler position).[3] Woods was one of four applicants for the job, which the company says was awarded based on merit rather than seniority. The candidates were scored using what the company alleges is its standard scoring matrix for awarding such jobs. Woods scored a "26." Two other candidates scored higher than Woods, and one scored lower. The job was awarded to Clifford Hartness, a white man who the company says scored a "30," although Woods correctly points out that Hartness only had 28 points, the same score as the second-place applicant. There is no evidence in the record as to the race of the other two applicants for the position.

At his follow up doctor's appointment on February 8, 2016, there was no change to Woods' medical restrictions. On February 11, 2016, Woods reviewed his medical restrictions with the plant nurse and, according to the company, indicated that "he would probably apply" for long term disability benefits ("LTD") rather than seek one of the jobs on the open jobs list that he could do with his medical restriction. While Woods apparently began a portion of the process for seeking LTD with the Company's third party LTD benefit program provider UniCare as early as February 8, 2016, there is no evidence in the record of when the application was completed or, more significantly, what or when the Company knew about his application. In Carter's affidavit, he states, without explanation, that "by applying for LTD benefits Woods abandoned his claim to his regular job as a Set-Up Operator," and that "the plant nurse discussed this with Woods on February 11, 2016."[4]

---

[3] Like the Set-Up Operator position, the line-hauler position requires the "[a]bility to move a minimum of 50 lbs." Because Woods was not offered the position, that issue was never addressed.

[4] There is no evidence that the "plant nurse" had any human resources training or was given authority to act on behalf of the Company with respect to employment matters generally or the Company's ADA obligations specifically.

Shortly after this meeting with the plant nurse, Woods saw his doctor again on February 23, 2016, and the doctor revised Woods' medical restrictions after learning that the restrictions were preventing Woods from working. The next day, February 24, 2016, Woods presented the Company with the doctor's note that said Woods could return to work without restrictions. Upon receiving this note removing Woods' medical restrictions, Carter contacted Woods, who was still on unpaid medical leave and no longer receiving short term disability. Despite the absence of restrictions (and presumably the Company's continued belief that Woods could still do the job because of his satisfactory performance after returning from surgery), Woods was not given the opportunity to return to his former job. There is no evidence in the record that no Set-Up Operator position was available on February 24, 2016 nor is there any evidence of when all such positions were filled or if Set-Up Operator positions ever became available after February 24, 2016. Instead, Woods was asked to select a job from the "open jobs list." Woods came in to select a job from the open jobs in March but was told that the job he selected was unavailable because it had already been taken by another employee.

Woods application for LTD benefits was denied on April 8, 2016. Woods did not appeal this decision because he said he didn't know how and, without short term disability benefits, he decided to draw from his retirement savings instead. Woods does not allege that Defendants were responsible for the denial of his application for LTD benefits.

Woods filed an EEOC charge on April 18, 2016.[5] In his charge, Woods alleged he had been discriminated against based on his race and disability in violation of Title VII and the ADA. The Charge refers to a medical condition for which he had surgery and a doctor's note requesting "an accommodation of lifting restrictions." He also specifically complained in the

---

[5] He also filed an EEOC charge on July 7, 2016 with the same allegations.

Charge about the Line-Hauler position being given to an employee of a different race with less seniority.

After Woods filed his initial EEOC charge, the company tried to get him to come in and again select a job from the "open jobs list." This was not immediately successful. Carter sent Woods a letter telling him that if he did not communicate with the company by July 18, 2016 the company would consider Woods to have voluntarily resigned his employment. Woods came in on July 19, 2016 and reviewed the open jobs list. The company says that he asked for a few days to consider his options; Woods says that he was told to take two or three days. Woods says he came back on July 25, 2016 when Carter was on vacation and was told to wait until Carter came back. He ultimately discussed his "open job" selections with Carter on August 1, 2016. But, by then, the jobs which Woods selected - the only first shift jobs on the list – were again "not open" because they had been previously taken by other employees.

Woods then returned on August 22, 2016 and selected another job – a "Pack End" job – that was listed as open and the Company said was available. The parties dispute what happened next. The company says that Woods needed only to revisit his doctor, bring in a new return to work slip and commence his new job. Woods does not directly address the "Pack End" job opportunity but claims that he felt that he was led to believe that he did not have a real option to return to work. On August 30, 2016, Woods voluntarily retired, according to the company. Woods does not deny that he wrote that he "retired" on "a scrap piece of paper," but he disputes the characterization of the voluntariness of the "retirement," claiming that he was effectively "terminated" because "Defendants refused to allow me to work at their place of business, and Defendants refused to pay me."

### III.    DISCUSSION

#### A.    **ADA Disability Claims**

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to ... the ... discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Failing to reasonably accommodate an employee's disability is a type of discrimination, 42 U.S.C. § 12112(b)(5)(A).

To establish  a prima facie case for failure to accommodate an employee under the ADA, a plaintiff must allege facts to show "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position ...; and (4) that the [employer] refused to make such accommodations." *Wilson v. Dollar Gen. Corp*., 717 F.3d 337, 345 (4th Cir. 2013) (internal citations omitted).

#### 1.  **Was Woods "Disabled"?**

The first defense raised by the Defendants is that Woods was not "disabled" within the meaning of the ADA. Defendants argue that Woods was able to perform his job despite the incontinence caused by his prostate cancer, so he was not disabled and that the company did not regard him as disabled, despite his medical restrictions. Woods argues in response that the "evidence of Woods' cancer diagnosis, medical treatment, and subsequent remission" establishes that he has a "disability" under the ADA. The Court finds Woods' position more persuasive, particularly under recent Fourth Circuit authority that emphasizes that whether someone is "disabled" under the ADA should be interpreted broadly and generously construed at summary judgment.

Under the ADA, a "disability" may take any of the following forms: (1) "a physical or mental impairment that substantially limits one or more major life activities" (the "actual-disability" prong); (2) "a record of such an impairment" (the "record-of" prong); or (3) "being regarded as having such an impairment" (the "regarded-as" prong). 42 U.S.C. § 12102(1); *Summers v. Altarum Institute, Corp*., 740 F.3d 325 (4th Cir. 2014). Woods alleges that he was disabled under the ADA's actual-disability prong. Specifically, he asserts that his disability was cancer. His cancer also led to his inability to lift – which the ADA recognizes as one of the "major life activities" whose substantial limitation qualifies as a disability. 42 U.S.C. § 12102(2)(A). Also, he suffered from incontinence when he was not under medical restrictions that limited his lifting.

Cancer is considered an impairment under the ADA, 29 C.F.R. §1630.2(h)(1); the functioning of one's immune system is a major life activity, 42 U.S.C. § 12102(2)(B); and Congress has instructed the courts to determine whether a limitation is substantial in light of its command to interpret disability broadly. 42 U.S.C. § 12102(4)(B), ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553. Further, "an impairment that is . . . in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. §12102(4)(D). *See Elliot v. Spencer*, No. 1:15cv813 (M.D.N.C. 2017) (ruling on a motion to dismiss that plaintiff was regarded as disabled because he was dismissed from a school program because he was "sick"). *See also Alston v. Park Pleasant, Inc*., 679 Fed.Appx. 169 (3rd Cir. 2017) (unpublished) ("The ADAAA broadened the scope of ADA coverage by expanding the definition of disability to include a range of symptoms—such as reduced immune functioning or abnormal cell growth—characteristic of cancer and other diseases…. We agree that cancer can— and generally will—be a qualifying disability under the ADA.").

Recently, in *J.D. by Doherty v. Colonial Williamsburg Foundation*, 925 F.3d 663, 670 (4th Cir. 2019), the Fourth Circuit Court of Appeals held that in considering whether an impairment substantially limits an individual in a major life activity, "we construe the statutory text 'broadly in favor of expansive coverage,' keeping in mind that the language 'is not meant to be a demanding standard.' 28 C.F.R. § 36.105(d)(1)(i). This interpretation is consistent with the purpose of the ADA Amendments Act of 2008 ("ADAAA"), which was passed to 'reinstat[e] a broad scope of protection to be available under the ADA.' *Summers v. Altarum Inst., Corp*., 740 F.3d 325, 329 (4th Cir. 2014) (quoting Pub. L. No. 110–325, § 2(b)(1), 122 Stat. 3553). Furthermore, the ADAAA makes explicit that the 'substantially limits' inquiry is to be made 'without regard to the ameliorative effects of mitigating measures,' such as 'learned behavioral ... modifications.' 42 U.S.C. § 12101(4)(E)(i). Instead, we are to consider impairments in their 'unmitigated state.' *Rohr v. Salt River Project Agric. Improvement & Power Dist*., 555 F.3d 850, 862 (9th Cir. 2009)."

In this case, there is at least a genuine issue for trial that Woods is disabled under these principles. Beyond the cancer diagnosis itself, not being able to control one's urinary habits and incontinence substantially impairs one's ability to "car[e] for oneself." 29 C.F.R. § 1630.2(i)(1)(i). And, mitigating measures, such as going to the bathroom frequently or wearing protective clothing (which would be behavioral modifications) cannot be considered in evaluating the disability. Further, the "lifting" restriction is considered a substantial life impairment. *See id*. ("[D]iabetes will be assessed in terms of its limitations on major life activities when the diabetic does not take insulin injections or medicine and does not require behavioral adaptations such as a strict diet.").

Also, even impairments that last only for a short period of time may be covered "if sufficiently severe." The EEOC appendix illustrates these principles: "[I]f an individual has a back impairment that results in a 20–pound lifting restriction that lasts for several months, he is substantially limited in the major life activity of lifting, and therefore covered under the first prong of the definition of disability." *Summers*, 740 F.3d at 329, *quoting* 29 C.F.R. § 1630.2(j)(1)(i) (2013). Accordingly, Woods medical restrictions on lifting would qualify as a disability, even though they were later removed by his doctor.

### 2. Did Defendants Reasonably Accommodate Woods?

The Company admits that it had notice of Woods' cancer and medical restrictions, so Woods has established that Defendants had notice of his disability, even though they deny that they considered him to be disabled. The remaining issues for Woods to establish his prima facie case under the ADA relate to "reasonable accommodation" – could Woods perform the essential functions of the position with reasonable accommodation and did the Defendants provide such accommodations." *See Wilson* at 345.

The term "reasonable accommodation" means "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability ... to perform the essential functions of that position." 29 C.F.R. § 1630.2(o )(1)(ii). While "reallocating or redistributing nonessential, marginal job functions" is a potential reasonable accommodation, 29 C.F.R. pt. 1630 app. § 1630.2(o), an accommodation is not reasonable under the ADA if it "reallocate[s] essential functions," id.; *see also Peters v. City of Mauston*, 311 F.3d 835, 845 (7th Cir.2002) (holding that the employee's request that someone else do the heavy lifting for him was "unreasonable because it [would] require[ ] another person to perform an essential function of

[the] job"). *Tyndall v. Nat'l Educ. Ctrs., Inc*., 31 F.3d 209, 213 (4th Cir.1994) (quoting *Chandler v. City of Dallas*, 2 F.3d 1385, 1393 (5th Cir.1993)); accord 29 C.F.R. § 1630.2(n)(1).

It is undisputed that an essential function of Woods' Set Up Operator position required that he lift up to 50 pounds so he would not have been able to perform all the essential functions of that job during the period that he had medical restrictions that limited his lifting. However, when those restrictions were lifted in late February, he would have been able to return to the job with the reasonable modifications that allowed him to do the job after his surgery (bathroom breaks, etc.). However, Defendants did not return him to that job.

The company says that Woods was told that simply by applying for LTD – even though his medical restrictions were lifted months before his LTD application was ruled on (and denied) – he forever gave up his opportunity to go back to his regular job. This seems to suggest that he was not allowed to return to his or another job (even with reasonable accommodation) because he or others believed, correctly or otherwise, he was disabled, which in turn would arguably violate the ADA. Also, Woods testified that other employees were allowed to return to their jobs, specifically a woman named Tammy Todd,[6] and the Company admits that other employees have returned to work after medical leave, although it is unclear whether they returned to the same or a different job.

In sum, the Court finds that a reasonable jury could conclude that, as Woods alleges, the Company wanted him to go on long term disability or retire after he received his restrictions in November 2015 and consequently did not fulfill its obligation to reasonably accommodate his disability by either offering him his old job back or putting him in a different job that he could

---

[6] Defendants properly criticize Woods hearsay testimony about Todd – which can't be used to support a denial of summary judgment – but Carter's affidavit acknowledges that Todd returned to her regular job after being out of work because of cancer surgery.

perform, particularly after his medical restrictions were lifted. Therefore, MANN+HUMMEL is not entitled to summary judgment on Woods' ADA claims.

B.    Race Discrimination

In addition to his ADA claims, Woods alleges race discrimination pursuant to Title VII and 42 U.S.C. § 1981.[7] The elements of a prima facie case are the same for both claims. *See Sanders v. Tikras Technology Solutions Corp.*, 725 Fed. Appx. 228, 229 (4th Cir. 2018) (citations omitted). In broad summary, the Company argues that it is entitled to summary judgment because Woods has no evidence that race was a motivating factor in any decisions made by the Defendants and, second, Woods did not suffer an adverse employment action because he allegedly voluntarily retired.[8]

Title VII prohibits employers from "fail[ing] or refus[ing] to hire ... any individual, or otherwise to discriminate against any individual ... because of such individual's race." 42 U.S.C. § 2000e–2(a)(1). A plaintiff may establish such a Title VII violation in two ways. First, a plaintiff may demonstrate through direct evidence that illegal discrimination motivated an employer's adverse employment action. Alternatively, a plaintiff may proceed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See generally Hill v. Lockheed Martin Logistics Mgmt., Inc*., 354 F.3d 277, 284–85 (4th Cir.2004) (en banc); *Cherry v. Elizabeth City State University*, 147 F.Supp.3d 414, 421 (E.D.N.C. 2015)

---

[7] 42 U.S.C. § 1981 prohibits discrimination in employment based on race and is evaluated under the same elements applied to claims for racial discrimination under Title VII. *Nnadozie v. Genesis HealthCare Corp*., 730 F. App'x 151, 156 (4th Cir. 2018); *Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004).

[8] Because Woods has not established race was a motivating cause of any employment action against him, the Court need not reach the issue of whether a genuine issue of material fact exists concerning whether he "suffered an adverse employment action" with respect to his claims of racial discrimination.

Direct evidence is evidence from which no inference is required. To show race discrimination by direct evidence, a plaintiff typically must show discriminatory motivation on the part of the decision maker involved in the adverse employment action. *See Hill*, at 286–91. Such direct evidence would include a decision maker's statement that he did not promote a plaintiff due to his race. *See id.* at 303. The decision maker must be either the employer's formal decisionmaker or a subordinate who was "principally responsible for," or "the actual decisionmaker behind," the allegedly discriminatory action. *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 151–52, (2000); *Holley v. N.C. Dep't of Admin*., 846 F.Supp.2d 416, 427 (E.D.N.C.2012).[9]

Here, Woods has not offered any direct evidence of racial discrimination. In his deposition, Woods was asked about the effect of race on the awarding of the Line-Hauler position to a white employee. Woods testified:

> *Q. Okay. Now, do you have any evidence that if you'd been white you'd have gotten to [sic] job instead of Hartness, or is that just kind of your belief?*
>
> *A. That's what I believe.*
>
> *Q. Okay. And you also told the EEOC that you were – you suffered discrimination on the basis of your disability. Now, when you said disability, what did you mean?*
>
> *A. The incontinence.*
>
> *Q. Okay. And do you have any evidence that if you had not had that problem you would have gotten the job, or is that just kind of what you believe?*

---

[9] Nevertheless, courts should not quickly attribute "to any ultimate decision maker ... the most unfortunate expressions and beliefs of those around him." *Merritt v. Old Dominion Freight Line, Inc*., 601 F.3d 289, 300 (4th Cir.2010). "[T]hat any distasteful comments will arise in the workplace" is regrettable. Id. "[B]ut that cannot mean that the actual decision maker is impugned thereby. It is the decision maker's intent that remains crucial, and in the absence of a clear nexus with the employment decision in question, the materiality of stray or isolated remarks is substantially reduced." Id.; *see Brinkley v. Harbour Recreation Clu*b, 180 F.3d 598, 608 (4th Cir.1999), overruled on other grounds by *Desert Palace. Inc. v. Costa*, 539 U.S. 90 (2003).

*A. Now, at this point they had their minds made up who they was going to give it to.*

*Q. Why do you think that they had their minds made up?*

*A. Well, Clifford rode motorcycles with Robert Ragan and he was good friends with Wes so —*

*Q. You think it was favoritism?*

*A. I think so.*

Even without direct evidence of race discrimination, a plaintiff s Title VII claim can survive summary judgment if the plaintiff raises a genuine issue of material fact under the burden-shifting framework established in *McDonnell Douglas*. Under this analysis, a plaintiff must first establish a prima facie case of discrimination. *See, e.g., St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). If a plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence that the defendant took the adverse employment action "for a legitimate, nondiscriminatory reason." *Burdine*, 450 U.S. at 254. If the defendant offers admissible evidence sufficient to meet its burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." *Hill*, 354 F.3d at 285 (quotation omitted).

To establish a prima facie case related to a job transfer or promotion, a plaintiff must show (1) that he belongs to a protected class; (2) that he applied for the position at issue; (3) that he was qualified for that job; and (4) that the defendant rejected his application under circumstances supporting an inference of unlawful discrimination. *See, e.g., Diamond v. Colonial Life & Accident Ins. Co*., 416 F.3d 310, 319 n. 6 (4th Cir.2005). An African American male may prove the fourth element by showing that the employer rejected his application and filled the job with a white male. *See Carter v. Ball*, 33 F.3d 450, 458 (4th Cir.1994).

In this case, Woods appears to have established a prima facie case with respect to the Line-Hauler position for which he applied. He is a member of a protected class, he applied for the position, there is no dispute regarding his qualifications for the position he selected,[10] and a white male was selected for the Line-Hauler position (there is no evidence in the record of who was selected for the other "open" positions, which were not available when Woods selected them).

So, the burden shifts to the Company to provide a legitimate, non-discriminatory reason for its decision not to select Woods. A defendant's burden of providing a legitimate, non-discriminatory reason is one of production, not persuasion. *St. Mary's Honor Ctr.*, 509 U.S. at 509. A defendant must present its legitimate, non-discriminatory reason "with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 255–56. An employer's good faith belief that another candidate is better qualified due to that employee's job performance and experience is a legitimate, non-discriminatory reason for an adverse employment decision. *See, e.g., Heiko v. Colombo Sav. Bank. F.S.B.*, 434 F.3d 249, 259 (4th Cir.2006); *Diamond*, 416 F.3d at 319; *Honor v. Booz–Allen & Hamilton, Inc*., 383 F.3d 180, 189 (4th Cir.2004); *Evans*, 80 F.3d at 960.

With respect to the Line-Hauler position, the Company asserts that it selected Hartness through a comparison of scores in a standardized evaluation process that compared the candidates for the position. While Woods has offered fair criticism of the scoring and potential consideration of factors other than merit or seniority during the selection process, he has not

---

[10] The parties have focused on the jobs for which Woods applied or requested. There were apparently some other "non-lifting" jobs available that required supervisory experience, and Woods may not have been qualified for those positions.

argued that the process itself could not be a plausible legitimate,[11] non-discriminatory basis for selecting Hartness or another candidate who scored higher than Woods. Accordingly, it appears that Defendants have minimally met their burden of production to show a legitimate, non-discriminatory basis why Woods was not selected. Thus, the burden shifts back to Woods to demonstrate that the Company's justification is a pretext for race discrimination. *See, e.g., Hux v. City of Newport News*, 451 F.3d 311, 314–15 (4th Cir.2006).

A plaintiff can demonstrate pretext by showing that the alleged non-discriminatory "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of race discrimination." *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir.2004) (quotation omitted). In conducting this analysis, the court does not sit to decide whether the defendant in fact discriminated against the plaintiff based on race. *See, e.g., Holland v. Washington Homes, Inc*., 487 F.3d 208, 217 (4th Cir.2007); *Hawkins v. PepsiCo, Inc*., 203 F.3d 274, 279–80 (4th Cir.2000). Rather, the focus concerns whether plaintiff has raised a genuine issue of material fact as to pretext. *See, e.g., Hux*, 451 F.3d at 314–19; *Dugan v. Albemarle Cty. Sch. Bd*., 293 F.3d 716, 722 (4th Cir.2002).

When determining whether a plaintiff has sufficiently demonstrated the falsity of an employer's proffered justification, courts must recognize that an "employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful

---

[11] The Court does not reach the issue of whether an employment selection process based on favoritism or other considerations that don't reflect the relevant merits or seniority of the applicants (even if unrelated to race or other protected classes) would always be considered a "legitimate" process sufficient to satisfy the employer's burden of production to shift the burden on to the employee to raise a triable issue of pretextual discrimination. Here, Woods only allegation is that in this one job selection, the chosen applicant rode motorcycles with one of the decision makers and was friends with another, without any evidence being presented as to the connections of the decision makers with other applicants or whether the job selection process at the Company was similarly driven by alleged favoritism in other instances.

criteria." *Burdine*, 450 U.S. at 259; *see Causey v. Balog*, 162 F.3d 795, 801 (4th Cir.1998);

*Amirmokri v. Baltimore Gas & Elec. Co*., 60 F.3d 1126, 1130 (4th Cir.1995); *Mallory v. Booth*

*Refrigeration Supply Co*., 882 F.2d 908, 909–11 (4th Cir.1989).

Woods argues that he had more "seniority" than Hartness but does not otherwise suggest

that he was clearly more qualified for the position. Further, it appears undisputed that seniority

was not a qualification for the position, which was supposed to be awarded based on other

criteria.  If a plaintiff makes a strong showing that he was "discernibly better qualified" than the

candidate selected for a position, a plaintiff may have successfully raised a genuine issue of

material fact as to whether the employer's proffered justifications for hiring the successful

applicant are pretextual. *See Heiko*, 434 F.3d at 261–62. But "[w]hen a plaintiff asserts job

qualifications that are similar or only slightly superior to those of the person eventually selected,

the promotion decision remains vested in the sound business judgment of the employer." *Id*. at

261; *see Hux*, 451 F.3d at 314–19; *Causey*, 162 F.3d at 801.

Woods has not raised a genuine issue of material fact concerning whether he was

discernibly better qualified than Hartness. Rather, his testimony suggests that he believes the

reason why Hartness got the job was unrelated to his qualifications, i.e., that he was friends with

the decision makers.[12] Woods does complain about his score on the test, but that criticism simply

highlights the fact that the scoring in the evaluation plainly involved a significant measure of

subjectivity for all candidates. Without more, it does not raise a genuine issue of material fact

that the process (which may or may not have been "fair" in other respects such as "favoritism" or

even accurate scoring) was a pretext for racial discrimination. And, Woods' self-evaluation of

---

[12] Woods also has failed to make any showing that he was discernably better qualified than the
second-place candidate who also scored higher than Woods.

his qualifications does not alter this conclusion. *See, e.g., Evans*, 80 F.3d at 960; *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir.1980). Thus, it appears that Woods' pretext argument must fail.

In summary, because Woods has failed to raise a genuine issue of material fact as to race discrimination[13] the Court will grant the Defendants' motion for summary judgment on Woods' claim of race-discrimination under both Title VII and Section 1981.

C.      Retaliation

Woods further alleges retaliation under Section 1981, the FMLA and the North Carolina Equal Employment Practices Act. An employer is prohibited from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a) (codified as amended). Like his claim for race discrimination, Woods has offered no direct evidence of retaliation and relies on the *McDonnell Douglas* framework. Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of retaliation. *See, e.g., St. Mary's Honor Ctr.*, 509 U.S. at 506; *Burdine*, 450 U.S. at 252–55; *Holland*, 487 F.3d at 218; *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 190 (4th Cir.2001).

To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in protected activity; (2) his employer took an action against him that a reasonable employee would find materially adverse; and, (3) the employer took the materially adverse employment action

---

[13] While Woods generally alleges racial discrimination in the fact that he did not work after November 4, 2015, Woods has not provided evidence that would satisfy his prima facie case as to his unsuccessful attempts to work at the Company beyond his unsuccessful attempt to obtain the Line-Hauler position. Specifically, he has not offered evidence of the race of the employees who were given the jobs that were initially presented to him as "open," but which he was later told were unavailable.

because of the protected activity. See, e.g., *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243,250 (4th Cir.2015); *Boyer–Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 271 (4th Cir.2015) (en banc); *Balas v. Huntington Ingalls Indus., Inc*., 711 F.3d 401,410 (4th Cir.2013); *Holland*, 487 F.3d at 218; *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir.2004); *Bryant v. Aiken Reg'l Med. Ctrs. Inc*., 333 F.3d 536, 543 (4th Cir.2003); *Spriggs*, 242 F.3d at 190.

An adverse employment action includes "a discriminatory act that adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment." *Holland*, 487 F.3d at 219 (quotation omitted) (alteration in original). A plaintiff establishes this element if the complained-of action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry.*, 548 U.S. at 68, 126 S.Ct. 2405 (quotation omitted).

The standard for retaliation under the FMLA is the same as the three-pronged test for retaliation under Title VII or § 1981 described above. Under the FMLA, "…[a] plaintiff claiming retaliation must first make a prima facie showing that he engaged in a protected activity [taking FMLA leave], that the employer took adverse action against him, and the adverse action was causally connected to the plaintiff's protected activity." *Vannoy v. Federal Reserve Bank of Richmond*, 827 F.3d 296, 304 (4th Cir. 2016).

The structure and grounds for Woods retaliation claim are not clearly stated. First, he has not specifically described what he contends was his "protected activity." Filing an EEOC charge, complaining about unlawful discrimination, seeking FMLA leave, or seeking a reasonable accommodation of a disability could all be "protected activity," but Woods has not been clear on his contentions. In his Second Amended Complaint, he states that Defendants retaliated against him "for pursuing a reasonable accommodation and for complaining about Defendants' unlawful

conduct." In his response brief, Woods seems to allege that his protected activity was related to his requests for FMLA leave.

Giving Woods the benefit of all inferences at this stage of the proceedings, any of this conduct might be considered "protected activity" and his allegation that he was not offered several jobs for which he applied would be an adverse employment action. However, Woods has not offered any evidence to causally connect any alleged protected conduct with his inability to find work with the Company after November 4, 2015. With respect to the EEOC charges, Defendants subsequently offered Woods the opportunity to apply for jobs and ultimately offered him a job in August 2016. With respect to the request for a reasonable accommodation, although there is an issue whether Defendants met their burden of making a reasonable accommodation for Woods' disability as discussed above, there is no evidence that he was denied the accommodation in retaliation for asking for it. Finally, Woods cannot causally connect any request for FMLA leave to an adverse employment action when the Defendants in effect gave him similar unpaid leave, albeit designated as "medical leave."

In summary, it does not appear that a reasonable jury could find that Defendants failed to give Woods another job after November 2015 as retaliation against him for any "protected activity." Accordingly, the Court will grant the motion for summary judgment as to Woods retaliation claims.[14]

D.    **Woods' Other Claims**

---

[14] As to Woods' retaliation claim under state law, the North Carolina Supreme Court has held that there is no private right of action for retaliation under NCEEPA. *See Whit v. Harris Teeter, Inc.*, 359 N.C. 625 (2005). So, Defendants are entitled to summary judgment on that claim as well.

In addition to his ADA, race discrimination and retaliation claims, Woods has asserted claims alleging that (1) he was denied FMLA leave, (2) he was discharged in violation of North Carolina public policy, (3) defendants violated North Carolina's wage and hour law and (4) the Court should award him declaratory relief. For the reasons stated below, Defendants are entitled to summary judgment on each of these claims.

Woods received more than the 12 weeks of yearly FMLA leave to which he was entitled, even though the company designated much of the leave as medical leave. "In order to establish a claim for violation of the FMLA, including interference of rights thereunder, [plaintiff] had to prove not only the fact of interference, but also that the violation prejudiced her in some way." *Anderson v. Discovery Communications*, LLC, 517 F. App'x 190, 197 (4th Cir. 2013). Woods ultimately received sixty-four (64) weeks of unpaid leave from the time of his cancer surgery through August 2016, when the Company claims he retired. Accordingly, Woods was not prejudiced by any alleged failure to provide him sufficient leave under the FMLA and cannot maintain a claim that the Company violated the FMLA.

In North Carolina, a claim for discharge in violation of public policy does not exist unless the employer terminated the relationship. The North Carolina Court of Appeals in *Gravitte v. Mitsubishi Semiconductor Am.*, ruled on this issue and held that plaintiff "must allege facts which indicate that she was in fact 'discharged.'" *Gravitte v. Mitsubishi Semiconductor Am.,* 109 N.C. App. 466 (1993). While Woods was arguably placed in a difficult position by the company's failure to put him into any of the jobs he requested until late August 2016, the circumstances of the offer of employment to him in August 2016 and his decision not to pursue the position, even if some of the details are disputed, does not raise a genuine issue of material

fact sufficient to allow the claim that he was *terminated in violation of public policy* to proceed to trial.

Regarding the state wage and hour claim, North Carolina courts have held that the NCWHA only assures compensation to workers for the hours they <u>actually</u> worked. *See Narron v. Hardee's Food Sys., Inc.*, 75 N.C. App. 579, 582-83, 331 S.E.2d 205, 207-08. *disc. review denied*, 314 N.C. 542, 335 S.E.2d 316 (1985) ("[G]iving the statutory language its natural and ordinary meaning, the Wage and Hour Act requires an employer…to pay those wages and benefits due when the employee has <u>actually performed the work</u> required to earn them.") (emphasis added).

The NCWHA does not reach claims for back-pay, which is payment for wages that would have been earned but were not earned due to an unlawful termination of employment. *See Swanson v. Chem-Nuclear Systems, Inc.*, 1997 WL 33621597, at *3 (E.D.N.C. September 15, 1997) ("Thus, a logical predicate of recovery under § 95-25.7 is that the discharged employee must first have *actually earned* the wages before he/she is entitled to compensation for them."). It is undisputed that Woods was paid for the time he actually worked, so, therefore, he cannot establish a wage and hour claim.

Finally, Woods seeks a judicial declaration by this Court that Defendants have engaged in unlawful discriminatory and retaliatory acts against him. "Declaratory relief is redundant and unavailable under circumstances where it essentially seeks nothing more than the legal determination already before the court on Plaintiff's civil rights claims." *Shepherd v. U.S. Olympic Committee*, 464 F.Supp.2d 1072, n. 8 (D. Co. 2006). All the claims on which Woods seeks a declaration of rights are before the Court as legal claims. Therefore, a declaratory

judgment is unnecessary and inappropriate. *See Pitrolo v. County of Buncombe, N.C.*, 589 Fed. Appx. 619 (4th Cir. 2014).

## IV.    ORDER

**NOW THEREFORE IT IS ORDERED THAT**:

1. Defendant's' "Motion for Summary Judgment" (Doc. No. 36) is **GRANTED** in part and **DENIED** in part;

2. **Partial Summary Judgment** in favor of Defendants is entered on Plaintiff's Claims in Count One (Title VII), Count Two (§1981), Count Three (Retaliation), Count Four (Wrongful Discharge), Count Five (Wage and Hour Act), Count Six (Declaratory Judgment) and Count Eight (FMLA); and

3. Defendants' Motion for Summary Judgment is **DENIED** as to Count Seven (ADA) and that claim shall proceed to trial on the merits.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: August 7, 2019

Kenneth D. Bell
United States District Judge